Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 23, 2003       Decided July 27, 2004

No. 02-5342

MCDONNELL DOUGLAS CORPORATION,
APPELLANT

v.

UNITED STATES DEPARTMENT OF THE AIR FORCE AND
F. WHITTEN PETERS, SECRETARY OF THE AIR FORCE,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01693)

———

*Stephen S. Kaye* argued the cause and filed the briefs for appellant.

*Tricia S. Wellman*, Senior Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: GINSBURG, *Chief Judge*, and EDWARDS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* GARLAND.

GINSBURG, *Chief Judge*: McDonnell Douglas, a wholly owned subsidiary of Boeing, appeals from a judgment in favor of the Air Force in this "reverse" Freedom of Information Act case. McDonnell Douglas challenges as arbitrary and capricious and otherwise contrary to law the decision of the Air Force to release to Lockheed Martin Aircraft Center pricing information contained in the contract the Air Force awarded to McDonnell Douglas for the maintenance and repair of KC–10 and KDC–10 aircraft. We affirm the judgment of the district court insofar as it upheld the decision of the Air Force to release the Over and Above Work Contractor Line-items (CLINs); we reverse that judgment insofar as it approved release of option year prices and Vendor Pricing CLINs.

## I. Background

In 1997 the Air Force issued a request for proposals (RFP) to perform maintenance and repair work on its fleet of KC–10 and KDC–10 aircraft. McDonnell Douglas submitted a bid which, in compliance with the requirements of the RFP, contained detailed pricing information both for the base year of the proposed contract and for subsequent years in which the Air Force would have the option to renew the contract. In June 1998 the Air Force awarded the contract to McDonnell Douglas. The contract, which provided for a base year and eight option years, incorporated the pricing information McDonnell Douglas had submitted in its bid.

In July 1998 Lockheed asked the Air Force, pursuant to the FOIA, 5 U.S.C. §§ 551 *et seq.*, for a copy of the contract. The Air Force duly notified McDonnell Douglas of Lockheed's request, and McDonnell Douglas promptly objected.

Although McDonnell Douglas agreed some of the requested information must be disclosed, including the bottom-line price for the base year of the contract, the Company maintained the option year prices and the prices listed in certain of the CLINs came within Exemption 4 of the FOIA, which exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Exemption 4 does not itself prohibit an agency from disclosing commercial or financial information; it provides only that an agency is not compelled to disclose such information. The Trade Secrets Act, 18 U.S.C. § 1905, however, the scope of which is "at least coextensive with Exemption 4," *CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1151 (D.C. Cir. 1987), effectively prohibits an agency from releasing information subject to the exemption. *See McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1164 (D.C. Cir. 1995) ("whenever a party succeeds in demonstrating that its materials fall within Exemption 4, the government is precluded from releasing the information by virtue of the Trade Secrets Act").[1]

Over a period of two years McDonnell Douglas sent the Air Force 11 submissions advancing its argument that option year prices, Vendor Pricing CLINs, and Over and Above Work

---

[1]    The Trade Secrets Act provides a criminal penalty for anyone who

> publishes, divulges, discloses, or makes known in any manner or extent not authorized by law any information coming to him in the course of his employment or official duties ... which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount, or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation or association.

18 U.S.C. § 1905. Although the proprietor of commercial information does not have a private right of action to enforce § 1905, it may seek review of an agency action that violates the Trade Secrets Act on the ground it is "contrary to law," per § 10 of the Administrative Procedure Act, 5 U.S.C. § 702. *Chrysler Corp. v. Brown*, 441 U.S. 281, 317 (1979); *Widnall*, 57 F.3d at 1164.

CLINs are exempt from disclosure. Unpersuaded, the Air Force issued a Final Administrative Decision Letter in June 2000 concluding Exemption 4 was inapplicable and stating it would release the contract pricing information to Lockheed.

McDonnell Douglas then filed in district court a two-count complaint alleging the Final Decision (1) was arbitrary and capricious and contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and (2) violated the Trade Secrets Act. Upon cross-motions for summary judgment the district court held the decision of the Air Force to release the option year prices and the disputed CLINs "was not arbitrary or capricious," and hence did not violate the APA. *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 215 F. Supp. 2d 200, 203 (D.D.C. 2002). The court also granted summary judgment to the Air Force on McDonnell Douglas's claim under the Trade Secrets Act on the ground the Act "does not afford 'a private right of action to enjoin disclosure in violation of the statute.'" *Id.* at 204 n.2 (quoting *Chrysler*, 441 U.S. at 316–17). McDonnell Douglas now appeals, advancing only its APA claim.

## II. Analysis

As an initial matter McDonnell Douglas contends the Air Force misapplied the governing legal standard in determining that the option year prices, the Vendor Pricing CLINs, and the Over and Above Work CLINs are not exempt from disclosure pursuant to Exemption 4. McDonnell Douglas also argues the decision of the Air Force to disclose those data was arbitrary and capricious and contrary to law.

### A. Standard of Review

We review *de novo* the district court's grant of summary judgment. *See LaCedra v. Executive Office for United States Attorneys*, 317 F.3d 345, 347 (D.C. Cir. 2003). In determining whether the decision of the Air Force was arbitrary and capricious, we do not "substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

On the other hand, we do not defer to the agency's conclusory or unsupported suppositions. *Id.*

B.   The *National Parks* Standard

That McDonnell Douglas was required to provide to the Air Force the option year prices and the information in the CLINs in order to compete for the contract is undisputed. That is no doubt why the parties agree the standard set out in *National Parks & Conservation Association v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) (*National Parks I*), governs whether the contested information falls within the scope of Exemption 4.   In *National Parks I*, we held financial information is "confidential" and therefore within the scope of Exemption 4 if it is required to be submitted to the Government and if its disclosure is "likely . . . to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* at 770.

McDonnell Douglas argues the Air Force misapplied the test of *National Parks I* because it required McDonnell Douglas to demonstrate "with certainty" release of the contested information would cause the Company substantial competitive harm.   Indeed, according to McDonnell Douglas the Final Administrative Decision Letter is "riddled with demands for certainty."   *National Parks I*, of course, does not require the party invoking Exemption 4 to prove disclosure certainly would cause it substantial competitive harm, but only that disclosure would "likely" do so.   *See id.; Gulf & W. Indus. v. United States*, 615 F.2d 527, 530 (D.C. Cir. 1979).

As we read the Final Administrative Decision Letter, the Air Force did not misinterpret or misapply the test of *National Parks I*.   On the contrary, it expressly concluded "release of the requested information will not likely cause *substantial* competitive harm to [McDonnell Douglas]." (Emphasis in original).   Although the Air Force did not use the word "likely" at every opportunity in the course of its analysis of whether disclosure would cause substantial competitive harm, it is quite clear the agency knew what was required to meet the *National Parks I* standard and sought to apply that standard accordingly.

McDonnell Douglas seizes upon the Air Force's statement that a competitor could not reverse-engineer the Company's commercially sensitive information "with certainty," but it does not follow that the Air Force required McDonnell Douglas to demonstrate substantial competitive harm would certainly occur. The issues are distinct: even if a competitor could determine the pricing strategy and markups McDonnell Douglas used in bidding for the present contract, the question would remain whether as a result McDonnell Douglas would likely suffer substantial competitive harm, with respect either to the option years in this contract or to future contracts. Therefore, we can not agree with McDonnell Douglas that the Air Force committed a wholesale error in applying the standard laid down in *National Parks I*, although we disagree with certain of the agency's more particularized conclusions, to which we now turn.

C.  Option Year Prices

McDonnell Douglas argues release of the option year prices in the contract would likely cause it substantial competitive harm for two reasons. First, McDonnell Douglas anticipates its competitors would use their knowledge of those prices in an effort to convince the Air Force to rebid the contract rather than exercise its option annually to renew it. As the Air Force points out, however, McDonnell Douglas failed to make this argument before the agency. Whether the Final Decision of the Air Force was arbitrary and capricious must be determined solely upon the basis of the arguments and information before the agency at the time. *See Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision"). McDonnell Douglas's argument that only the agency — and not the party challenging the agency's decision — is prohibited from advancing a *post hoc* argument is simply incorrect. *See Military Toxics Project v. EPA*, 146 F.3d 948, 957 (D.C. Cir. 1998) (by failing to raise argument to agency appellant forfeited the argument and "may not raise it for the first time upon appeal").

Second, McDonnell Douglas argues disclosure of the option prices in the contract likely will cause it substantial competitive harm because, in the event the Air Force does decide to rebid the contract, its competitors will be able to use that information to underbid it. The Air Force responds with two reasons for which rebidding is unlikely. First, "option years of contracts are usually exercised," and a contract to service military aircraft is "even less susceptible to a new competition on the basis of price than most [contracts]." Second, "under the standards mandated by the [Federal Acquisition Regulations], the option years of the contract will be exercised unless the market changes considerably," in which event McDonnell Douglas would also "necessarily change [its] pricing strategy" and thereby "greatly diminish any potential competitive value" of knowing the option year prices. Now it is McDonnell Douglas's turn to point out that neither of these considerations played any role in the decision here under review: the Air Force never suggested McDonnell Douglas would not likely be harmed because the contract would not likely be rebid. We do not rely upon counsel's *post hoc* rationale for upholding an agency's action. *See Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986); *Yukon-Kuskokwim Health Corp. v. NLRB*, 234 F.3d 714, 718 (D.C. Cir. 2000).[2]

The Air Force also suggests three reasons even a rival bidder that did know McDonnell Douglas's option year prices would not know what it would take to underbid McDonnell Douglas. First, the Air Force claims a rival would never know the exact "price to beat" because McDonnell Douglas's nominal option prices are subject to revision pursuant to the

---

[2] Although we will remand a matter to an agency where the agency's initial explanation of its decision was inadequate, *e.g.*, *Northeast Md. Waste & Disposal Auth. v. EPA*, 358 F.3d 936, 949–50 (D.C. Cir. 2004), we do not typically remand to permit the agency an opportunity to adopt an entirely new explanation first suggested on appeal. The Air Force had numerous opportunities to argue that "rebidding is not likely," Dissent at 9, and to offer the detailed analysis Judge Garland presents in his dissent; it never did so. We see no reason to give the Air Force yet another chance.

Economic Price Adjustment Clause in the contract. As McDonnell Douglas points out, however, the index used to determine the final option price in each option year is identified on the face of the Adjustment Clause and is publicly available. If the option year prices in the contract were released, then it would be a matter of simple arithmetic to calculate the adjusted option year prices. *See Greenberg v. FDA*, 803 F.2d 1213, 1218 (D.C. Cir. 1986) (combination of allegedly confidential information and publicly available information sufficient evidence of competitive harm to defeat summary judgment motion).

Second, the Air Force contends a rival's price, to be attractive, would have to be lower than McDonnell Douglas's bid by enough to offset the "costs of disrupting operations." This transaction cost argument, however, did not figure in the agency's decision that McDonnell Douglas would not likely be harmed by release of its option year prices, and hence can play no part in our review.

Finally, the Air Force argues that, even if it does rebid the contract, McDonnell Douglas is unlikely to suffer competitive harm because the new bid price "would be only one of several evaluation factors for award" of the new contract. The RFP for the existing contract listed the six criteria for evaluating bids — logistics, maintenance/repair/modifications, management, safety/fire protection, quality, and cost/price — which were "to be weighted equally" in selecting the winning bid. The Air Force contends, therefore, any rebid contract would be awarded to the bidder that offered the "best value" based upon all six factors and not necessarily to the bidder with the lowest price.

As Boeing correctly points out, we considered and rejected this argument in *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303 (1999). In that case the agency argued disclosure of the contested information would not cause McDonnell Douglas to be underbid "because price is only one of many factors used by the government in awarding contracts." *Id.* at 306. We thought the argument "too silly to do other than to state it, and pass on," *id.*, but the argument's resurrection here

suggests we should take greater pains to explicate the problem with the Air Force's position.

Simply put, release of the option year prices in the present contract would likely cause McDonnell Douglas substantial competitive harm because it would significantly increase the probability McDonnell Douglas's competitors would underbid it in the event the Air Force rebids the contract. *See Gulf & W. Indus.*, 615 F.2d at 530 (substantial competitive harm likely where disclosure "would allow competitors to estimate, and undercut, its bids"). Because price is the only objective, or at least readily quantified, criterion among the six criteria for awarding government contracts, submitting the lowest price is surely the most straightforward way for a competitor to show its bid is superior. Indeed, price is by statute the only factor that "*must* be considered in the evaluation of a proposal." 10 U.S.C. § 2305(a)(3)(A)(ii) (emphasis added). Whether price will be but one of several factors to be weighted equally in any future RFP, therefore, is necessarily somewhat speculative.

The Air Force nonetheless presses the view, which the district court accepted, that its present argument "differs markedly" from the argument we rejected in *NASA*. *McDonnell Douglas*, 215 F. Supp. 2d at 208. The district court restated the Air Force's present argument as follows: "even if underbidding were to occur, the fact that price is just one of many factors means that the effect of the underbidding would be diluted by other factors." *Id.* The district court reasoned that unlike the NASA, which had argued competitors would not underbid McDonnell Douglas, the Air Force acknowledged that competitors might underbid McDonnell Douglas but argued the Company would not be harmed because the Air Force would consider nonprice factors in awarding the contract. *Id.* The district court clearly used the term "underbid" to mean "bid a lower price," but that is not how we used the term in *NASA*; there "underbidding" refers to making a bid more attractive overall, not with respect only to price, so it will be chosen by the Government. *See NASA*, 180 F.3d at 303 ("[T]he agency 'reasoned' that underbidding due to the disclosure would not occur because

price is only one of the many factors used by the government in awarding contracts"). Obviously, any competitor would try to bid a lower price than McDonnell Douglas; the NASA was not so foolish as to deny that. Instead, the agency there made the same argument as does the Air Force here, *viz.*, that the NASA would not accept a bid merely because it offered a lower price but instead would consider nonprice factors in selecting the winning bid. We rejected this argument summarily in *NASA*, and we reject it again here for the reason given in the preceding paragraph.

We conclude disclosure of McDonnell Douglas's option year prices would likely cause McDonnell Douglas substantial competitive harm by informing the bids of its rivals in the event the contract is rebid.[3] Consequently, the option year prices fall within the scope of Exemption 4, and the decision of the Air Force to release them was contrary to law.

D. Vendor Pricing CLINs

McDonnell Douglas argues the release of prices for certain CLINs composed predominantly of the costs of materials and services it procures from other vendors would enable its competitors to derive the percentage (called the "Vendor Pricing Factor") by which McDonnell Douglas marks up the bids it receives from subcontractors. McDonnell Douglas argues release of the disputed CLINs would likely harm its competitive position because Lockheed "most likely obtained quotations from the same vendors," with "the same or nearly the same pric[es]."

---

[3] The dissent faults the court for not resolving McDonnell Douglas's additional claim that disclosure of the option year prices in the contract was also likely to cause it competitive harm because its competitors could reverse-engineer certain sensitive pricing factors from the option prices. *See* Dissent at 11–12. Because we conclude that disclosure of the option year prices would likely cause McDonnell Douglas competitive harm by enabling competitors to undercut its prices, the court has no occasion to continue on in dicta to decide whether McDonnell Douglas would also suffer competitive harm from reverse-engineering of its sensitive pricing factors.

In explaining its decision to release those CLINs the Air Force stated it is "entirely possible," indeed "not uncommon," for a subcontractor to "quote different prices . . . to different prime contractors." Therefore, the Air Force reasoned, McDonnell Douglas's competitors could not "with any degree of certainty" derive its Vendor Pricing Factor from disclosure of the Vendor Pricing CLINs and hence McDonnell Douglas is unlikely to suffer substantial competitive harm.

The problem with this line of reasoning is its premise, namely, the mere supposition that McDonnell Douglas and Lockheed received — or may well have received — significantly different prices from the same vendors bidding for the same subcontract. The Air Force provided no actual evidence, nor did it claim special knowledge based upon its experience, to support this proposition, apart from the rather casual observations that it was "entirely possible" and "not uncommon." This is tantamount to the Air Force saying it would "not be surprised" if the rival bidders had received different prices from subcontractors, but it is far short of asserting (let alone substantiating) that it was "likely" they did so.[4] Nor does it seem probable as a matter of economic theory. In a competitive market for subcontracted work, a rational subcontractor would quote each prime contractor the lowest price consistent with covering its costs. Any difference in the prices it quotes different prime contractors should, in theory, reflect differences in the costs of supplying them. Therefore, it is reasonable to presume, as McDonnell Douglas did in its submissions to the Air Force, that its "competitors obtained similar pricing from various vendors to

---

[4] The Air Force's conclusory statement that "it is not uncommon" for subcontractors to quote different prices to different primes is not a "prediction" or a "forecast" regarding "the repercussions of disclosure," to which we ordinarily defer; it is a "declaration of empirical fact." *CNA Fin. Corp.*, 830 F.2d at 1155. Although we may defer to the "predictive judgment" of an agency absent record evidence, *id.*, we will not defer to a declaration of fact that is "capable of exact proof" but is unsupported by any evidence. *Cf. id.*

support those tasks."[5]

Perhaps the Air Force, which we recognize has "knowledge of the government contracting industry," *McDonnell Douglas*, 215 F. Supp. 2d at 208, has reason to believe the markets in which its prime contractors purchase goods and services are not effectively competitive.[6] Having failed to explain how

_____

[5] The presumption is reasonable because McDonnell Douglas can not be faulted for failing to produce evidence of the prices its subcontractors charged to other primes, such as Lockheed. *See* Maj. Francis Dymond, *DoD Contractor Collaborations*, 172 MILITARY LAW REVIEW 96, 139 (noting "the secretive nature of collaborations and their complexity"). Because only the Air Force received information from both primes, the burden of producing such evidence should lie, if anywhere, with it. *Cf. Occidental Petroleum v. SEC*, 873 F.2d 325, 342 (D.C. Cir. 1989) ("It is far more efficient, and obviously fairer, to place the burden of production on the party who claims that the information is publicly available").

[6] Relying upon analyses contending that the market for weapons systems is not competitive, Dissent at 6 n.5, 7 n.6, Judge Garland says it is "plausible" for the Air Force to speculate that the market for servicing aircraft is not competitive either, because "[o]ngoing relationships between the vendor and different primes . . . could affect the vendor's decision of the price to charge." Setting aside whether the teaming arrangements and joint ventures characteristic of weapons manufacturing are pro- or anti-competitive, we have no basis for assuming the market for servicing the DC/KC/KDC–10 family of aircraft — which aircraft are used in both civil and military aviation and, hence, have multiple civilian and military customers and suppliers — is characterized by the same alleged failures as the oligopolistic market for weapons systems. In any event, if the Air Force had offered some explanation or evidence of the sub/prime contractor market at issue here along the lines of that now supplied by Judge Garland, then perhaps its argument would be persuasive. To be sure, the Air Force need not provide "the kinds of evidence more usually associated with elaborate antitrust proceedings," *National Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 681 (D.C. Cir. 1976), but its assertion regarding subcontractor pricing is not a prediction; it is an assertion capable of, but entirely lacking in, substantiation. *Cf. CNA Fin.*, 830 F.2d at 1155.

its knowledge or experience supports that understanding, however, the decision of the Air Force is neither "at least as compelling as McDonnell Douglas's," *McDonnell Douglas*, 215 F. Supp. 2d at 209, nor "well-reasoned, logical[,] and consistent," *CNA Financial*, 830 F.2d at 1155; it is, in short, arbitrary and capricious.

E. Over and Above Work CLINs

Finally, McDonnell Douglas challenges as arbitrary and capricious the decision of the Air Force to disclose CLINs containing the hourly labor rates McDonnell Douglas charges the Air Force for "Over and Above Work," that is, maintenance and repair work not required under the contract, which the Air Force is not required to direct to McDonnell Douglas. The Company first complains a competitor with knowledge of these rates would be able to underbid it for Over and Above Work. Because McDonnell Douglas did not make this specific argument to the Air Force prior to its issuance of the Final Decision, we shall not consider it. McDonnell Douglas also complains, however, that knowledge of these CLINs "would clearly place such a competitor at a distinct advantage over [McDonnell Douglas] in any contract (commercial or military) awarded on the basis of a price comparison." Specifically, McDonnell Douglas claims it was "no secret" — based upon local newspaper articles published in 1996 — the Company paid the "going wage" at its new Boeing Aerospace Support Center (BASC), located at the former Kelly Air Force Base in San Antonio; releasing the labor rates it charges for Over and Above Work, therefore, would enable its competitors to calculate the "overall markup (or labor pricing factor)" McDonnell Douglas uses, to its detriment in bidding on future contracts.

In an effort both to make sense of and to refute this claim, the Air Force responds that a competitor could not "safely assume" McDonnell Douglas either pays its blue collar employees the "prevailing wage" or meets the "standard for fringe benefits" in the area, both as determined by the Department of Labor. Moreover, the Air Force found McDonnell Douglas submitted "significantly different" rates

for Over and Above Work in the present contract and in a contract to service KC–135 aircraft at the BASC; a competitor therefore could not reasonably infer the Over and Above Work CLINs in the present contract accurately reflect the Labor Pricing Factor McDonnell Douglas will use in bidding on some future contract.

McDonnell Douglas presents neither a viable theory nor any evidence to support its claim that release of the Over and Above Work CLINs would enable a competitor to derive its Labor Pricing Factor. The 1996 newspaper articles McDonnell Douglas submitted to the Air Force to prove its competitors know how much the Company pays its mechanics are not persuasive. For example, a newspaper report that the "average blue collar worker" at Kelly AFB earned $28,352 per year two years before the BASC was established there, *see* http://www.boeing.com/defensespace/aerospace/maintenan ce/basc.html, does not reveal anything about the prevailing wage for McDonnell Douglas employees performing work under the contract at the BASC — then or now. Nor does McDonnell Douglas present any evidence that the cost of the benefits it currently provides to mechanics is publicly known; the average salary at Kelly AFB reported in 1996 specifically "exclud[ed] benefits," and incoming contractors (such as McDonnell Douglas) had announced that "retirement and vacation [benefits] would differ from what civil servants [were then receiving]."

Based upon the publicly available information the Company submitted to the Air Force, the agency reasonably concluded McDonnell Douglas failed to carry its burden of showing release of the Over and Above CLINs was likely to cause it substantial competitive harm. Therefore, the decision of the Air Force to release the CLINs was not arbitrary and capricious. *See CNA Fin. Corp.*, 830 F.2d at 1155–56.

F.   Business Judgment and Risk Assessment

In a coda to its brief, the Air Force argues disclosure of "the type of pricing information that is at issue" in this case is unlikely to cause substantial competitive harm to McDonnell Douglas because a rival company can never understand fully

or model precisely the "business judgment and risk assessment" that go into another firm's pricing decisions.

We recoil, as does McDonnell Douglas, from the implication of this argument, namely, a per se rule (or at least a strong presumption) that all constituent pricing information — as opposed to the bid price itself — is to be disclosed; such a rule would be squarely at odds with the protection we have always understood Exemption 4 to provide for such pricing information. *See, e.g., NASA*, 180 F.3d at 306; *Widnall*, 57 F.3d at 1164; *Gulf & W. Indus.*, 615 F.2d at 530. To be sure, there may be, as the Air Force suggests, too many "unascertainable," *Acumenics Research & Technology v. Department of Justice*, 843 F.2d 800, 808 (4th Cir. 1988), or "fluctuating," *Martin Marietta Corp. v. Dalton*, 974 F. Supp. 37, 40 (D.D.C. 1997), variables for a firm to model exactly or to pinpoint precisely a rival's pricing strategy, but pinpoint precision is not required to inflict substantial competitive harm.

\* \* \*

Before concluding, we respond to two claims made by our dissenting colleague. First, our analysis in Parts II.C. and II.D does not come "close to a per se rule" that contract line-item prices "may never be revealed to the public through the [FOIA]." Dissent at 1, 15. McDonnell Douglas has not urged such a rule, and we have not considered one. Our decision that disclosure of such pricing information is not required in this case turns upon the particular facts that make disclosure here "likely . . . to cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks I*, 498 F.2d at 770.

In any event, Judge Garland's suggestion that disclosure of the vendor prices implicates "the core purpose of FOIA," Dissent at 2, is doubtful. The decision of the Air Force "to expend a specified amount of public funds," *id.* at 18, has already been disclosed to the public; indeed, the total contract price paid by the Government "is routinely made public," JAMES T. REILLY, 1 FEDERAL INFORMATION DISCLOSURE § 14.84 (3d ed. 2004), because that disclosure informs citizens

about "what their government is up to." *Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989). The pricing information Lockheed seeks, however, has little to do with the core purpose of the FOIA, namely, " 'contributing significantly to public understanding of the operations or activities of the government.' " *Dep't of Defense v. FLRA*, 510 U.S. 487, 495 (1994) (quoting *Reporters Comm.*, 489 U.S. at 775). On the contrary, the information now in suit reveals the internal workings of the contractor, not those of the Government, and would seem to shed little if any light upon the "agency's performance of its statutory duties." *Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 356 (1997) (per curiam). *Cf. Reporters Comm.*, 489 U.S. at 773 (purpose of FOIA "is not fostered by disclosure of information about private citizens . . . that reveals little or nothing about an agency's own conduct"). For all the Government tells us, the contractor's margin on particular line items should be a matter of indifference to the purpose of the FOIA. The decision made by the Air Force was whether to accept McDonnell Douglas's or Lockheed's overall bid; whether the lower bidder marked up one cost element by a large margin and another by a small margin, in the course of making its bid competitive overall, is not self-evidently relevant to the question what the "government is up to."

That the vendor prices at issue here do not seem to concern the core purpose of the FOIA does not mean, however, that line-item pricing information is per se protected from disclosure. As noted above, McDonnell Douglas did not argue for a per se rule, and we do not endorse such a rule in deciding certain prices are protected from disclosure in this case.

## III. Conclusion

For the foregoing reasons, we reverse the judgment of the district court insofar as it upholds the decision of the Air Force to release the option year prices and the Vendor Pricing CLINs in McDonnell Douglas's KC–10 and KDC–10 contract. We affirm the judgment of the district court inso-

far as it authorizes the Air Force to release the Over and Above Work CLINs.

*So ordered.*

GARLAND, *Circuit Judge*, concurring in Parts II.B and II.E., and dissenting in Parts II.C and II.D: This court has twice thought it "passing strange" that "the prices charged to the government for specific goods could be confidential" commercial information or "trade secrets" under the Freedom of Information and Trade Secrets Acts. *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 306 (D.C. Cir. 1999); *see McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1167 (D.C. Cir. 1995). We have never decided that fundamental question, however, because the government has never litigated whether such prices are subject to those statutes — and hence to the *National Parks* test — in the first place.[1] For the same reason, we do not do so in this case. Nonetheless, the analysis adopted and result reached in Parts II.C and II.D of the court's opinion come perilously close to a per se rule that line-item prices — prices the government agrees to pay out of appropriated funds for goods or services provided by private contractors — may never be revealed to the public through a Freedom of Information Act (FOIA) request. Because, if such prices are covered by the statutes at all, a bar on their disclosure should be the exception rather than the rule, I respectfully dissent.

## I. Vendor Pricing Contractor Line Item Numbers (CLINs)

In Part II.D of its opinion, the court denies the Air Force authority to disclose prices for certain line items in its contract with appellant McDonnell Douglas (referred to in the record by the name of its parent company, Boeing). These are not mere offer or bid prices; they are prices that the government agreed to pay, and that it did pay, for specified services that it purchased from the company. Disclosure of such information permits the public to evaluate whether the government is receiving value for taxpayer funds, or whether

[1] *See Widnall*, 57 F.3d at 1167 ("Although the idea that a price charged to the government for specific goods or services could be a 'trade secret' appears passing strange to us, we agree with the government that it is not open to us to attempt to decide that issue at this stage. . . . [T]he Air Force has never stated its position on McDonnell Douglas' claim that even exercised option prices are trade secrets.").

the contract is instead an instance of waste, fraud, or abuse of the public trust. (I hasten to add that no such allegations are even hinted at here.) Such disclosure thus comes within the core purpose of FOIA: to inform citizens about "what their government is up to." *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989); *see NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.").

It is therefore not surprising that, even applying the *National Parks* test, the vast majority of courts have permitted the release of agreed-upon contract prices, including line-item prices. *See* Gregory H. McClure, *The Treatment of Contract Prices Under the Trade Secrets Act and Freedom of Information Act Exemption 4: Are Contract Prices Really Trade Secrets*, 31 PUB. CONT. L.J. 185, 196–97 (2002). That is overwhelmingly the result in the district courts of this circuit. *See Center for Public Integrity v. United States Dep't of Energy*, 191 F. Supp. 2d 187, 194–95 (D.D.C. 2002) (collecting cases). It is also the result reached by the only other circuits that have decided FOIA cases regarding such prices. *See Pacific Architects & Eng'rs Inc. v. United States Dep't of State*, 906 F.2d, 1345, 1347–48 (9th Cir. 1990); *Acumenics Research & Tech. v. United States Dep't of Justice*, 843 F.2d 800, 808 (4th Cir. 1988). This circuit has ruled on the releasability of line-item prices on only one previous occasion, and in that case decided that the prices could not be disclosed. *See NASA*, 180 F.3d at 307.[2] As discussed in Part II

---

[2] The other two cases cited by my colleagues, Op. at 15, are not apropos. Because of the "unusual posture" in which the *Widnall* case came to this court, we declined to rule on whether the prices at issue could be disclosed and instead remanded to the Air Force for clarification of its own position regarding release. 57 F.3d at 1167. In *Gulf & Western Industries, Inc. v. United States*, the requested disclosure was not of line-item contract prices, but rather of a government audit containing the objector's "profit rate" and "actual costs for units produced." 615 F.2d 527, 529–30 (D.C. Cir. 1979).

below, however, that case did not consider facts and arguments like those raised by the Air Force here.

The dispositions reached by the majority of courts are unsurprising, not only in light of the core purpose of FOIA, but also because of the nature of the *National Parks* test and of the way we review its application. As the court correctly recites, disclosure of information of the kind at issue here is barred only if it is "likely . . . to cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974). In the case of line-item prices, such harm will result only if a competitor is able to "reverse-engineer" from the winning bidder's price to the sensitive strategic information upon which it is based, such as the contractor's profit margin and cost data.[3] The ability to "pinpoint precisely a rival's pricing strategy" is obviously not required to satisfy this test, Op. at 15, but the objector must demonstrate that a rival will be able to derive strategic information that is "likely" to cause it "substantial" competitive harm. *National Parks*, 498 F.2d at 770.

---

[3] *See Pacific Architects*, 906 F.2d at 1347–48 (affirming disclosure because a competitor would not be able to calculate the contractor's profit margin from its unit prices since there were too many "fluctuating variables"); *Acumenics*, 843 F.2d at 808 (affirming agency decision to disclose awarded unit prices because "there are too many unascertainable variables in the unit price calculation for a competitor to derive accurately [the contractor's profit] multiplier"); *North Carolina Network for Animals, Inc. v. United States Dep't of Agric.*, 924 F.2d 1052, 1991 WL 10757, at *3 (4th Cir. Feb. 5, 1991) (unpublished table decision) (holding that release of sales and price information is required where it "reveals nothing useful about the dealer's pricing structure," such as "the dealer's sources and costs of acquisition, customer information, [or] profit margin"); *see also* 1 JAMES T. O'REILLY, FEDERAL INFORMATION DISCLOSURE § 14:83, at 705 (3d ed. 2000) ("Where disclosure of contractor bid price details is at issue, the existence of variable factors that make it difficult to disaggregate a price figure would tend to support an agency denial of confidentiality for aggregate bid amount.").

Moreover, the objector must accomplish this demonstration within the constraints of our scope of review. First, it is the opponent of disclosure — not the requester — who bears the burden of proving whether substantial competitive harm is likely to result. *See Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 342 (D.C. Cir. 1989); *National Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 679 n.20 (D.C. Cir. 1976) (*National Parks II*). Second, in evaluating whether the objector has met that burden, we defer to the judgments of the agency, and may overturn them only if they are arbitrary or capricious. *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1153–55 (D.C. Cir. 1987). In particular, we must defer to the agency's expert prediction regarding the likely impact of disclosure upon the marketplace. *See id.* at 1155–56 (holding that an agency's forecast of "what likely would ensue upon release of information" is the type of judgment that "courts traditionally leave largely to agency expertise" and "need not be supported by record evidence").

Applying *National Parks* and the appropriate standard of review, it is plain that the line-item prices at issue here do not qualify for protection from disclosure. The sole reason my colleagues offer for reaching the opposite conclusion is their acceptance of appellant's argument that, because the disputed prices are "composed predominantly of the costs of materials and services it procures from other vendors," disclosure of those prices would permit derivation of the percentage "by which McDonnell Douglas marks up the bids it receives from subcontractors." Op. at 10. That argument, in turn, rests on the validity of McDonnell Douglas' assertion, in its appellate brief, that its competitor "most likely obtained quotations from the same vendors" with "the same or nearly the same prices" and could thus derive McDonnell Douglas' mark-up simply by subtracting those known vendor prices from the line-item prices contained in the contract. Op. at 10 (quoting McDonnell Douglas Br. at 20).

But McDonnell Douglas' assumption that its competitor "likely" obtained the same price quotations from the same vendors is simply not sufficient to carry its burden of proof on the issue. The contractor's letter to the Air Force makes

clear that this is indeed nothing more than an assumption: "It is reasonable to *assume*," McDonnell Douglas said, "that our competitors obtained similar pricing from various vendors to support these tasks." McDonnell Douglas Letter to Air Force, Aug. 3, 1998, at J.A. 20 (emphasis added). That is the entirety of the contractor's submission on this point. *Id.* The Air Force, however, directly contradicted that assumption, declaring that "it is not uncommon for a vendor to quote different prices for the same basic effort to different prime contractors." Air Force Final Administrative Decision Letter, June 23, 2000, at J.A. 74 (hereinafter Final Decision Letter). Although my colleagues disparage this declaration — contending that the Air Force "provided no actual evidence, nor did it claim special knowledge based upon its experience, to support this proposition," Op. at 11 — such disparagement is unfair for two reasons.

First, in context, the Air Force's declaration appears to be precisely the "actual evidence" based on considerable "experience" with such procurement contracts that my colleagues require. In contrast to McDonnell Douglas' acknowledgment that its assertion was based on nothing more than a "reasonable assum[ption]," the Air Force's statement that "it is not uncommon" for vendors to quote different prices reads as a declaration of empirical fact. *Cf. CNA*, 830 F.2d at 1155 (upholding agency response to objector's affidavits, despite the agency's lack of "independent evidence" to support its determination).

Second, and equally important, my colleagues' approach stands the burden of proof on its head. Because identical vendor pricing is the premise of McDonnell Douglas' argument that it will be harmed by disclosure, it is the contractor's burden to prove that such pricing is a fact — not the government's burden to disprove it. *See National Parks II*, 547 F.2d at 679 n.20. There is no such evidence in McDonnell Douglas' submissions below; instead, the company offers precisely the type of "conclusory and generalized allegations" of harm that we have previously found "unacceptable." *Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1291 (D.C. Cir. 1983). Yet it is the Air Force that my

colleagues upbraid for this lacuna, not the party that bears the burden and responsibility for filling it.[4]

Lacking empirical support in the record, the opinion of the court turns to economic theory to support its conclusion: "In a competitive market for subcontracted work, a rational subcontractor would quote each prime contractor the lowest price consistent with covering its costs." Op. at 11. This is a theory of the court's own invention: McDonnell Douglas did not make the argument in its submissions to either the Air Force or this court. Nor is there any basis for my colleagues' assumption that there is, in fact, "a competitive market for subcontracted" military procurements. Indeed, all indications are to the contrary.[5] The market at issue here is hardly one in which a myriad of buyers face a myriad of sellers. After all, the line-item prices we are considering are not for supplying widgets, but for overhauling landing gear and maintaining auxiliary power units and engine thrust reversers on military aircraft whose "primary mission . . . is aerial refueling of other military aircraft." Air Force Br. at 2 n.2;

---

[4] I agree with the court that the Air Force's declaration regarding subcontractor pricing is one of "empirical fact." Op. at 11 n.4. What I disagree with is the court's refusal, in the absence of further evidence, to accord that declaration any deference — notwithstanding the Air Force's considerable experience with such matters and the fact that the burden lies on the opponent of disclosure. *CNA,* 830 F.2d at 1155, does not hold that such a declaration is unworthy of deference. *Compare* Op. at 11 n.4. Nor does *Occidental Petroleum*, 873 F.2d at 342, support the proposition that the Air Force should bear the burden of production, or that the Air Force's declaration would be insufficient to satisfy that burden even if it should. *Compare* Op. at 12 n.5.

[5] *See* Sherri Wasserman Goodman, *Legal Dilemmas in the Weapons Acquisition Process: The Procurement of the SSN–688 Attack Submarine*, 6 YALE L. & POL'Y REV. 393, 395–96 (1988) (noting multiple reasons why defense procurements do not conform to the "classical economic model of a competitive market"); *see also* William E. Kovacic, *Antitrust Analysis of Joint Ventures and Teaming Arrangements Involving Government Contractors*, 58 ANTITRUST L.J. 1059, 1091–97 (1989).

*see* Final Decision Letter, at J.A. 73–74. We know that there were only two competitors for the prime contract, *id.* at J.A. 72, and McDonnell Douglas advised the district court that there are only "a limited number of subcontractors who can perform the work required in these types of contracts," *McDonnell Douglas Corp. v. United States Dep't of Air Force*, 215 F. Supp. 2d 200, 208 (D.D.C. 2002). Indeed, that was the basis for the company's assertion that "competitors will have likely gone to the same subcontractors" and obtained the same prices. *Id.* In short, competitors for the prime contract did not obtain their prices from a faceless market, but rather from the same, relatively few vendors.

In this kind of imperfect, oligopolistic/oligopsonistic market, we cannot assume that the court's "rational subcontractor" theory of identical prices would hold. In fact, unlike McDonnell Douglas, the Air Force did address the theoretical question and explain why differential rather than identical pricing was not uncommon: "Ongoing relationships between the vendor and different primes for other business," the government said in its Final Decision Letter, "could affect the vendor's decision on the price to charge." J.A. 74. This opinion regarding the nature of the market — one in which subcontractors align with and provide better prices to their preferred primes to ensure other subcontracts — is surely plausible.[6] And in light of the Air Force's expertise and

_____

[6] *See, e.g.,* Robert Strauss & Joseph J. Dyer, *Enforcement of Teaming Agreements*, PROCUREMENT LAWYER, Fall 2001, at 5 ("Subcontractors . . . are leery of devoting significant resources (including key engineering talent, intellectual property, and bid and proposal costs) without a formal relationship being established with prime contractors through teaming agreements."); U.S. Gen. Accounting Office, Report to the Subcommittee on Acquisition and Technology, Committee on Armed Services, U.S. Senate, *Best Practices: DOD Can Help Suppliers Contribute More to Weapon Systems Programs* (Mar. 1998) (encouraging the trend among defense prime contractors to select preferred suppliers for subcontracting work based on criteria other than lowest price, such as quality and past performance); *see also* Kovacic, 58 ANTITRUST L.J. at 1095–97 (describing the anticompetitive effect of the proliferation of prime

experience in this area, it is one to which we must defer. *See CNA*, 830 F.2d at 1155 (citing *Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1 (1961), and *FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775 (1978)).

In short, unless we reverse the burden of proof and deny the Air Force the deference it is owed, there is no basis for overturning its conclusion that disclosure of the prices it paid for McDonnell Douglas' services is unlikely to cause substantial harm to the contractor's competitive position.

## II.  Option Year Prices

Today's opinion also bars the Air Force from disclosing line-item prices for option years contained in the contract with McDonnell Douglas.  Op. at Part II.C.  It does so based solely upon McDonnell Douglas' argument that: "[*I*]*n the event the Air Force does decide to rebid the contract*, its competitors will be able to use that information to underbid it."  *Id.* at 7 (emphasis added).  But McDonnell Douglas' contention that it will be hurt "in the event" the Air Force decides to put the contract out for rebid is insufficient to meet appellant's burden of showing that disclosure is "likely" to cause "substantial harm" to its competitive position.  *National Parks*, 498 F.2d at 770.  Since McDonnell Douglas does not contend that it will be injured if the contract is not rebid — i.e., if the government exercises the options — to prevail the contractor must establish that it is at least likely that there will be a rebid.  This is just another way of restating the threshold requirement of our *National Parks* test:  that the contractor must "actually face competition." *National Parks II*, 547 F.2d at 679; *accord Niagara Mohawk Power Corp. v. United States Dep't of Energy*, 169 F.3d 16, 18–19 (D.C. Cir. 1999).[7]

and subcontractor cooperative relationships in the defense industry).

[7] In *National Parks II*, this court held that, to establish that their commercial or financial information fell within Exemption Four, the

McDonnell Douglas has wholly failed to satisfy that threshold requirement. The appellant proffered no evidence whatsoever regarding the probability of a rebid. Indeed, it did not even assert that rebidding was likely. Rather, its submission to the Air Force said nothing more than: *"Should a recompetition occur,* Boeing's competitors, armed with its pricing for unexercised options[,] would be in a position to undercut Boeing's prices." McDonnell Douglas Letter to Air Force, Aug. 3, 1998, at J.A. 20–21 (emphasis added).

The government, by contrast, contends that rebidding is not likely. "[O]ption years of contracts," the Air Force explains, "are usually exercised." Air Force Br. at 19. And that is particularly so for contracts "to service military aircraft which are critical to USAF's core mission." *Id.* The Air Force's contention is backed by its regulations, which instruct it to "take into account the Government's need for continuity of operations and potential costs of disrupting operations" in deciding whether or not to exercise an option. 48 C.F.R. § 17.207(e); *see also id.* § 17.202(d) (providing that options may be included in service contracts in "recognition of (1) the Government's need in certain service contracts for continuity of operations and (2) the potential cost of disrupted support").[8] And it is further backed by the facts of this very case, as the Air Force "has exercised the past four option years for this contract each time they have come up." Air Force Br. at 20.

appellant National Park concessioners would have "to prove that: (1) they actually face competition, and (2) substantial competitive injury would likely result from disclosure." 547 F.2d at 679. The court found that the concessioners did not face meaningful competition for the renewal of their park concessions because denials of renewal were rare, although they did face day-to-day competition from businesses located outside the park. *Id.* at 681–82.

[8] A contract solicitation may not even contain an option clause unless the "contracting officer has determined that there is a reasonable likelihood that the option will be exercised." 48 C.F.R. § 17.208(c)(4).

Notwithstanding the logic and evidence supporting the government's claim that McDonnell Douglas has failed to satisfy the threshold requirement for application of *National Parks*, my colleagues rightly conclude that we cannot resolve this appeal on that basis because, although the Air Force vigorously advances the claim here, it did not rely on it below. But while we cannot affirm the agency's determination on that ground, we need not reverse it. When the government asserts a basis for decision that might well prevail if it were raised by the agency rather than its lawyers, we may remand to permit the agency an opportunity to reconsider its rationale. *See, e.g., Northeast Maryland Waste Disposal Auth. v. EPA*, 358 F.3d 936, 949–50 (D.C. Cir. 2004); *Yukon-Kuskokwim Health Corp. v. NLRB*, 234 F.3d 714, 718 (D.C. Cir. 2000). Hence, even if the government's entire argument rested on the limited likelihood of a rebid, nothing more than a remand for further consideration would be in order.

The Air Force's rationale for permitting disclosure does not, however, rest only on McDonnell Douglas' failure to establish that rebidding is likely to occur. It also rests on appellant's failure to prove it likely that it will suffer substantial competitive harm even if the contract were rebid. As noted, McDonnell Douglas' theory is that it will be harmed because, "in the event the Air Force does decide to rebid the contract, its competitors will be able to use [the options] information to underbid it." Op. at 7. The Air Force persuasively counters this theory by explicating its two significant flaws.

First, McDonnell Douglas has not demonstrated the likelihood that competitors would be able to use its option prices to underbid it. As McDonnell Douglas notes, if the Air Force were to decide not to exercise an option, it would conduct a new competition for the work. McDonnell Douglas Br. at 15. This would free McDonnell Douglas from the option agreements, and permit it to price the work differently. Recognizing this, appellant does not contend that its option prices would themselves enable competitors to underbid it, but rather that competitors would be able to use that "pricing information to 'deduce support hours, overhead factors, and

profit factors for the options' " — that is, they could use the option prices to reverse-engineer the factors that McDonnell Douglas would employ in pricing a new bid. *Id.* (quoting McDonnell Douglas Letter to Air Force, Sept. 3, 1998, at J.A. 27).

In response to McDonnell Douglas' reverse-engineering argument, the Air Force offered a detailed exposition — on a line-item by line-item basis — explaining why "[i]t does not appear that release of the CLIN prices and the CLIN Option Year Matrix would reveal any confidential piece of information, such as a risk assessment or profit multiplier, that would place Boeing at a competitive disadvantage." Final Decision Letter, at J.A. 71; *see id.* at J.A. 72–76 (CLIN by CLIN analysis); *id.* at 76 (concluding that "many of the basic assumptions underlying Boeing's arguments that a competitor can derive competitively sensitive rates and factors from Boeing's CLIN prices are . . . equally unfounded for the base year and the option years").[9]  Moreover, the Air Force noted, "in a contract which contains options extending far into the future, in this case a total of nine years, the value of the option prices as a predictive tool for Boeing future pricing is significantly diminished since such option prices almost certainly include significant adjustments for risks of unknown contingencies." *Id.*

The government's explanation for rejecting McDonnell Douglas' reverse-engineering claim is more than reasonable. Indeed, it is particularly powerful because, while McDonnell Douglas objects to disclosure of the option-year line items, it has withdrawn its objection to disclosure of many of the same line items in the contract's base year.  Air Force Br. at 18

---

[9] For example, the Air Force rejected McDonnell Douglas' claim that a competitor could derive its hourly rate to perform cyclical (C–Check) inspections by dividing the line-item price by the known standard hours to perform the tasks, because (inter alia) there are no standard hours for such inspections — a point demonstrated by the "significant variance, from task to task, in the number of C–Check hours proposed by the two competitors."  Final Decision Letter, at J.A. 72.

n.8. This leaves unexplained how a competitor's knowledge of McDonnell Douglas' option-year prices could materially improve its competitive position when the competitor already knows the prices appellant agreed to for the base year.

Given the reasonableness of the government's rationale, and the fact that the burden of proof rests on McDonnell Douglas, we cannot overturn the Air Force's decision without engaging in the same kind of line-item by line-item analysis that the Air Force did. The opinion of the court, however, does not undertake that task. Indeed, it does not address the Air Force's reverse-engineering argument at all.[10] Unless we are going to take the unprecedented step of adopting a per se rule that the release of line-item prices is always harmful and hence never permitted,[11] the failure to rebut the government's arguments requires affirmance of its decision.

The government's decision letter also exposes a second flaw in McDonnell Douglas' competitive injury theory. Even if disclosure of option prices would significantly increase the probability that a competitor could submit a lower bid, McDonnell Douglas would not be substantially harmed by such a bid unless it were sufficiently attractive to win the contract away from the incumbent contractor. And in the circumstances of this case, the Air Force contends that such a

---

[10] There is one exception: The court *affirms* the Air Force's rejection of McDonnell Douglas' claim that a competitor could derive its labor mark-up factors for "over and above work" with respect to the base year. Op. at Part II.E. Yet, the court does not explain why that determination should be any different with respect to the option years.

[11] As noted above, such a rule would be contrary to that adopted by other courts of appeals. *See* cases cited *supra* note 3. *Gulf & Western*, cited by my colleagues, is not to the contrary. In that case, a competitor would not have had to reverse-engineer anything: the sought-after information was not line-item contract prices, but rather government audits and annual financial statements that directly revealed the objector's "profit rate," along with its "actual costs for units produced, actual scrap rates, break-even point calculations and actual cost data." 615 F.2d at 529–30 (internal quotation marks omitted).

possibility is unlikely because price "would be only one of the evaluation factors for award" of the new contract:

> [I]t is important to remember that any Air Force recompetition for performance of KC–10 CLS for the option years would be conducted as a best value source selection, where price/cost would be only one of the evaluation factors for award, together with technical excellence and past performance. Based on the procedures followed in most of the other recent best value source selections conducted . . . for [contractor logistical support] requirements, price/cost likely would be no more important an evaluation factor than both technical excellence and past performance. The fact that price/cost would not be the controlling evaluation factor or even the most significant evaluation factor in any such recompetition greatly reduces any potential competitive advantage a competitor could gain through release of Boeing's option year CLIN prices and renders Boeing's allegations of substantial competitive harm in this regard largely unfounded.

Final Decision Letter, at J.A. 76. In response to the government's argument, McDonnell Douglas failed to show — or even to try to show — that disclosure of its option prices would enable competitors to submit bids at prices sufficiently low as to offset the advantages appellant gains from the other evaluation criteria.

My colleagues nonetheless dismiss the government's argument on the ground that, because we previously rejected it in *McDonnell Douglas v. NASA* as "too silly to do other than to state it," 180 F.3d at 306, we are bound to reject it again. Op. at 8. But this is not the argument that we rejected in *NASA*. And it is not silly at all.

The argument that we rejected in *NASA* was the agency's claim "that underbidding due to the disclosure would not occur because price is only one of the many factors used by the government in awarding contracts." *NASA*, 180 F.3d at 372. It is indeed foolish to argue that, just because non-price factors are also relevant, a competitor would not try to bid a lower price than McDonnell Douglas. But the Air Force does

not make NASA's argument here. The Air Force's argument is not that "underbidding … would not occur," but that underbidding is not likely to cause substantial harm — because competitors are not likely to be able to bid sufficiently below McDonnell Douglas' price to overcome appellant's non-price advantages. My colleagues render the two arguments the same only by assuming that the *NASA* court did not intend the word "underbidding" to have its ordinary meaning: "to bid less than (a competing bidder)." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1287 (10th ed. 1996). Instead, they insist that *NASA* intended the word to mean: "making a bid more attractive overall, not with respect only to price, so it will be chosen by the Government." Op. at 9. Nothing in *NASA*, however, supports this embellishment of the dictionary definition.

Nor is there anything silly about the argument that non-price factors make it unlikely that disclosure of McDonnell Douglas' option prices will permit competitors to defeat it in a recompetition. As the opinion for the court acknowledges, the Air Force's Request for Proposals (RFP) lists six criteria against which the government will evaluate bids — logistics, maintenance/repair/modifications, management, safety/fire protection, quality, and cost/price — and states that each "will be weighted equally." J.A. 179.[12] The court's opinion goes on to discount the significance of this "best value" method of contractor selection on the ground that, "[b]ecause price is the only objective, or at least readily quantified, criterion among the six criteria for awarding government contracts, submitting the lowest price is surely the most straightforward way for a competitor to show its bid is superior." Op. at 9. But whether or not low price is the most "straightforward" way to show superiority, the RFP makes clear that it will not be enough. So, too, does the entity that will make the final determination of superiority: The Air Force states in no

---

[12] By contrast, there is no indication that the RFP at issue in *NASA* contained such a provision, without which "equal" consideration of non-price factors would not have been authorized. *See* 10 U.S.C. § 2305(a)(3)(A)(iii)(I)-(II).

uncertain terms — both as a matter of policy and of its experience with "most of the other recent best value source selections conducted" — that "price/cost would not be the controlling evaluation factor or even the most significant evaluation factor in any such recompetition." Final Decision Letter, at J.A. 76. And while the governing statute requires the Air Force to consider price, 10 U.S.C. § 2305(a)(3)(A)(ii), it also expressly authorizes the Air Force to do just what the RFP and Final Decision Letter say it will do: consider non-price factors as "approximately equal in importance to cost or price." *Id.* § 2305(a)(3)(A)(iii)(II).

That the Air Force would prefer other factors over price is hardly surprising. The contract at issue here is not to supply cafeteria food, but to service planes that "will be flown by American military personnel on highly dangerous missions." Air Force Br. at 23. One would hope that for such a contract, considerations of safety, quality, and confidence in an incumbent contractor would at least be the equal of price. And as we have just seen, one need not simply hope that were the case: It says so right in the RFP. My colleagues are therefore wrong to suggest that "[w]hether price will be but one of several factors to be weighted equally in any future RFP . . . is necessarily somewhat speculative." Op. at 9. The Air Force has made clear — in both its RFP and Final Decision Letter — that price *will* be just such a factor, and that is a determination we should not second-guess. *See CNA*, 830 F.2d at 1155. Indeed, the only thing that *is* speculative is whether, in light of the announced evaluation criteria, a competitor would be likely to displace McDonnell Douglas as the prime contractor even if it had the advantage of seeing appellant's option prices. In the absence of even a proffer of evidence to support that conclusion, such speculation is plainly insufficient to satisfy McDonnell Douglas' burden of proof. *See Public Citizen*, 704 F.2d at 1291.

In dismissing the government's non-price factors argument and failing to address its reverse-engineering contention, my colleagues come perilously close to treating a contractor's claim of "underbidding" as a talisman that bars disclosure of any line-item price — whether related to an option year or to

a base year. But as the author of *NASA* made clear, that is an "overreading of our opinion," which "did not" hold "that government disclosure of line item pricing would invariably violate the Trade Secrets Act." *McDonnell Douglas Corp. v. NASA*, No. 98–5251, slip op. at 2 (D.C. Cir. Oct. 6, 1999) (Silberman, J., concurring in denial of rehearing en banc). Because McDonnell Douglas has failed to show that disclosure of option-year prices would violate the Act in this case, I would affirm the decision of the Air Force.

### III. Conclusion

For the foregoing reasons, I conclude that McDonnell Douglas' line-item and option-year prices fail to pass the *National Parks* test for nondisclosure, and that we therefore should respect the Air Force's determination to release that information. To return to the point I made at the start, however, there remains the underlying question of whether the *National Parks* test is properly applied to agreed-upon prices (and at least *exercised* options) at all. That is an important question because — although reverse-engineering analysis applied under that test will often, as it does here, permit disclosure of agreed-upon prices — application of *National Parks* may bar disclosure of such prices in the very situation in which the public interest in disclosure is at its apogee.[13]

The archetypal case is that of the toilet seats that the Navy purchased for $640 apiece in the early 1980s.[14] Whether the

---

[13] Although the FOIA requester in this case is a competitor of McDonnell Douglas, the same test — and the same result — applies when the requester is a watchdog organization dedicated to eliminating government waste. *See National Archives & Records Admin. v. Favish*, 124 S. Ct. 1570, 1580 (2004) (noting that the decision to disclose "does not depend on the identity of the requester").

[14] *See* Mike Ward, *It's Your Information: How a Federal Law Has Turned Citizens into Giant Slayers*, AUSTIN AMERICAN–STATESMAN, Oct. 6, 1996, at H1 (noting that a FOIA request "uncovered the now-famous case" of the Pentagon's "buying of gilt-priced toilet seats"). Such examples are not limited to military procurements.

story is apocryphal or not,[15] it serves to make the point: assuming that a low wholesale price for such seats is well-known, the only explanation for the high price paid by the government is the company's profit margin. And notwithstanding that there would be a great public interest in determining "what the[ ] government is up to" in paying such a profit margin, *Reporters Comm.*, 489 U.S. at 773,[16] that is precisely the case in which a "hard to reverse-engineer" argument would fail and disclosure would be barred under *National Parks*.

This counter-intuitive result should cause us to think hard about whether it makes sense to regard prices actually paid *by the government* as trade secrets "of any person" under the Trade Secrets Act, 18 U.S.C. § 1905, or as confidential commercial or financial information "obtained from a person" under Exemption Four of FOIA, 5 U.S.C. § 552(b)(4). *Cf.* RESTATEMENT OF TORTS § 757 cmt. b (1939) (excluding "the amount or other terms of a secret bid for a contract" from the definition of "trade secret"); *Public Citizen*, 704 F.2d at 1291 n.30 (noting that "competitive harm in the FOIA context" is limited to "harm flowing from the affirmative use of *proprietary information*" by competitors) (emphasis added; internal quotation marks omitted). It is indeed "passing strange" to

_____

*See, e.g.,* Justin Blum, *Energy Contract Used to Repair D.C. Schools; No–Bid Agreement Pays Utility Millions*, WASH. POST, Apr. 23, 2001, at A1 (noting that a FOIA request by the newspaper revealed that the D.C. public school system was charged exorbitant fees for cost-plus maintenance contracts).

[15] *See* Lawrence J. Korb, Editorial, *Toilet Seats: Defense Replies*, WASH. POST, Apr. 20, 1985, at A22 (stating that the $640 was for a "molded plastic cover for the entire lavatory," not for each seat).

[16] *See* Michael Weisskopf, *Radical Retooling to Be Urged For Pentagon Buying Machine: Commission Will Recommend Off-the-Shelf Shopping*, WASH. POST, Feb. 22, 1986, at A2 (reporting that discovery of the $640 toilet seats led to recommendations for significant reform of the procurement process); Wayne Biddle, *Price of Toilet Seat is Cut for Navy*, N.Y. TIMES, Feb. 6, 1985, at D15 (detailing the contractor's decision to cut prices in response to the controversy).

regard an agency's agreement to expend a specified amount of public funds as a corporate secret rather than a governmental decision — a category that is not encompassed by either statutory provision. *National Parks*, itself, did not concern disclosure of prices agreed to by the government, but rather of a firm's internal financial information obtained in a government audit. 498 F.2d at 770. And it is not at all obvious that a test designed to evaluate the latter is appropriate for the former. *See Reporters Comm.*, 489 U.S. at 773 (holding that disclosure of "[o]fficial information that sheds light on an agency's performance of its statutory duties falls squarely within [FOIA's] statutory purpose"). Moreover, even if agreed-upon prices do fall within Exemption Four, they may represent a case in which that exemption and the Trade Secrets Act should not be regarded as coextensive — and hence a case in which the government would have discretion to permit disclosure.[17]

But these are questions for another day. The only question for today, because it is the only question that the parties have litigated, is whether McDonnell Douglas has satisfied its burden of proving that the requested disclosures are likely to cause substantial harm to its competitive position. Because I conclude that appellant has failed to make that case for any of the information that the government has decided to release, I concur in my colleagues' decision that the "over and above work" prices may be disclosed, but respectfully dissent from their determination that the vendor-pricing and option-year line items may not.

---

[17] *Cf. Widnall*, 57 F.3d at 1165 n.2 (noting that, although there may be reasons to reconsider the circuit's view that the two statutes are coextensive, the Air Force did not seek reconsideration); *cf. also Chrysler Corp. v. Brown*, 441 U.S. 281, 292–93 (1979) (explaining that the "congressional concern" for the privacy interests of government contractors and other private entities "was with the *agency's* need for confidentiality," and that "FOIA by itself protects the submitters' interest in confidentiality only to the extent that this interest is endorsed by the agency").