McDONNELL DOUGLAS
CORPORATION,
Appellant,

v.

Sheila E. WIDNALL, Secretary, Department of the Air Force, and United States Air Force, Appellees.

Nos. 94–5156, 94–5157.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 17, 1995.

Decided June 30, 1995.

Jerald S. Howe, Jr., Washington, DC, argued the cause for appellant. With him on the briefs was Peter L. Wellington, Washington, DC.

Michael J. Ryan, Asst. U.S. Atty., Washington, DC, argued the cause for appellees. With him on the brief were Eric H. Holder, Jr., U.S. Atty. and R. Craig Lawrence, Asst. U.S. Atty., Washington, DC. Douglas A. Wickham and John O. Birch, Asst. U.S. Attys., Washington, DC, entered appearances.

Before: SILBERMAN, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

McDonnell Douglas appeals from a district court order denying its request for an injunction to restrain the Air Force from publicly releasing the prices of certain satellite launch services purchased from McDonnell Douglas. We remand to the district court with instructions to in turn remand the proceeding to the Air Force.

**I.**

Under Defense Department acquisition regulations (DFARs) providing for "[p]ublic [a]nnouncement" of contract awards, Air Force procurement personnel are directed to

"[r]eport all contractual actions, including modifications, that have a face value, *excluding unexercised options,* of more than $5 million." 48 C.F.R. § 205.303(a)(i) (1994) (emphasis added). These reports are forwarded to the Assistant Secretary of Defense (Public Affairs), *id.* § 205.303(a)(ii)(A), who publicizes the information, as well as to "members of Congress in whose state or district the contractor is located and the work is to be performed," *id.* § 205.303(a)(iii). In keeping with these obligations, the Air Force regularly proposed to announce the costs incurred by it in exercising certain options under two contracts previously entered into with McDonnell Douglas. The Air Force considers the decision to *exercise* options a "contractual action," and the costs to it of requesting the additional services exceeded the $5 million threshold. Fearing that competitors would find knowledge of its pricing practices useful when competing for future launch projects, McDonnell Douglas on two occasions initiated litigation to block the Air Force from making price announcements associated with its exercise of options under the two contracts. Both cases are at issue in this appeal.

The first of the two contracts, which the parties refer to as the Delta II contract, was entered into on November 1, 1991. Under its terms, McDonnell Douglas was to provide the Air Force with equipment and services for a series of satellite launches, each a complex and costly operation. In addition to the launch services actually purchased, the Air Force also secured options to buy additional services from McDonnell Douglas at specified prices. As the basic total price of the contract (*i.e.,* the total cost not including unexercised options) well exceeded $5 million, DFAR § 205.303(a)(i) obligated the Air Force to make the cost public. The figure released, however, represented the aggregated charges for all the services undertaken to be performed. The Air Force did not disclose McDonnell Douglas' pricing policies with regard to each item covered by the contract, nor did it reveal the terms of the agreement, including the option prices.

A few months later, in early 1992, the Air Force received a request under the Freedom of Information Act, 5 U.S.C. § 552 (1988), from General Dynamics Corp., one of McDonnell Douglas' competitors in providing satellite launch services. Although not directly at issue here, the Air Force's response to this request bears on its later disputes with McDonnell Douglas. General Dynamics sought the release of the Delta II contract—including the specific prices for each item purchased as well as all unexercised options. McDonnell Douglas, having been apprised of General Dynamics' request, objected. It claimed that virtually all the information sought fell within FOIA Exemption 4, which provides that an agency's disclosure obligations do not extend to requests for "trade secrets and commercial or financial information obtained from a person and privileged or confidential." *Id.* § 552(b)(4). According to McDonnell Douglas, the line item prices contained in the Delta II contract were confidential "trade secrets" or "commercial or financial information" and therefore could be withheld under Exemption 4 pursuant to *National Parks & Conservation Ass'n v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974), since their disclosure would result in competitive injury.

■ McDonnell Douglas also argued that, apart from Exemption 4, the Trade Secrets Act, 18 U.S.C. § 1905 (1988), *prohibited* the release of the information sought by General Dynamics. That statute provides, in relevant part, that:

> Whoever, being an officer or employee of the United States or any department or agency thereof ... publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties ... which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person ... shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

18 U.S.C. § 1905. A criminal statute, the Trade Secrets Act does not furnish a private cause of action against governmental disclosure, *see Chrysler Corp. v. Brown,* 441 U.S. 281, 316, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979) (citing *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)), but it can be relied upon in challenging agency action that violates its terms as "contrary to law" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1988). *Chrysler,* 441 U.S. at 318–19, 99 S.Ct. at 1725–26.

■ Although the two provisions relied upon by McDonnell Douglas perform distinct legal functions—Exemption 4 marks the outer boundaries of the government's FOIA privilege by identifying materials that a person making a FOIA request has no right to *force* the government to divulge, whereas the Trade Secrets Act establishes a private right against unauthorized governmental publications of confidential information—they are nevertheless closely related in terms of the materials to which they each apply. Indeed, we have stated that the scope of the Trade Secrets Act "is at least co-extensive with that of Exemption 4 of FOIA." *CNA Fin.Corp. v. Donovan,* 830 F.2d 1132, 1151 (D.C.Cir.1987). Consequently, whenever a party succeeds in demonstrating that its materials fall within Exemption 4, the government is precluded from releasing the information by virtue of the Trade Secrets Act.

In response to the FOIA request, the Air Force initially determined, in August 1992, that some of the Delta II contract material sought by General Dynamics was covered by Exemption 4, because its release would likely harm McDonnell Douglas in the bidding for another Air Force launch project, the MLV III program. *See National Parks,* 498 F.2d at 770. But it did not think that any competitive injury was likely to result from disclosing the rest of the information. McDonnell Douglas responded with additional arguments, primarily relying on this court's then-recent elaborations on the scope of FOIA Exemption 4 in *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871 (D.C.Cir.1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993). In *Critical Mass,* we held that "financial or commercial information provided to the Government on a voluntary basis is 'confidential' for the purposes of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Id.* at 879. McDonnell Douglas asserted that, in light of *Critical Mass,* the contract information which the Air Force had thought itself obliged to disclose under *National Parks* was now plainly not releasable.

The Air Force had yet to reach a final determination on General Dynamics' FOIA request when, in an unrelated move, it decided to exercise certain of its options under the Delta II contract. In keeping with DFAR § 205.303, the Air Force proposed to announce the costs of the options, which exceeded the regulation's $5 million threshold. McDonnell Douglas opposed the announcement, and on the day the option was exercised, September 30, 1992, filed suit in the district court under the APA, initiating the first of the two actions that have occasioned this appeal. McDonnell Douglas' complaint sought a temporary restraining order and preliminary injunction against the Air Force's planned release of the exercised option prices on the ground that such a disclosure would be illegal under the Trade Secrets Act. The court agreed with McDonnell Douglas' arguments and granted the injunction in an oral decision from the bench. The Air Force filed a motion for reconsideration.

While that motion was pending, the Air Force came to a final determination on General Dynamics' FOIA request. In a decision memorandum dated November 5, 1992, the Air Force concluded that, in light of *Critical Mass,* much of the contract information that it had initially thought itself bound to release actually fell within Exemption 4. In the Air Force's view, however, DFAR § 205.303's provision for announcement of expenditures over $5 million complicated the analysis for the disclosure of *exercised* option prices, since the Trade Secrets Act (and, therefore, FOIA Exemption 4) does not apply to confidential information whose release by the government is "authorized by law." 18 U.S.C. § 1905. Indeed, with respect to the exer-

cised option prices, the Air Force appeared in the memorandum to doubt whether the price of materials actually *purchased* by the government might reasonably be thought confidential information covered by Exemption 4 in the first place. The Air Force ultimately concluded, however, that it did not need to resolve this issue—which it noted was currently "being litigated with respect to the releasability of the price of the [exercised Delta II] option"—since the district court injunction prohibited the release of the disputed information in any event.

Several months later, in April 1993, McDonnell Douglas was awarded the contract for the Air Force's MLV III project as well. Price announcement disputes arising from this agreement eventually led to the second of the two lawsuits consolidated in this appeal. As with the Delta II contract, the MLV III contract provided the Air Force with options to purchase future launch services in addition to those actually committed to under the agreement.[1] When the Air Force decided in December 1993 that it would exercise additional MLV III options in mid-January 1994, McDonnell Douglas again objected to the proposed accompanying disclosure of the pricing information on the grounds that release was barred under the Trade Secrets Act. The Air Force at first proposed to treat the district court's injunction in the Delta II case, which was still being litigated, as precedent governing the releasability of the MLV III options prices (albeit the court's order did not by its terms bind the Air Force beyond the specific announcement at issue in the case). Ultimately, however, the Air Force changed course and informed McDonnell Douglas that it would be releasing the information pursuant to DFAR § 205.303. There is no indication in the record of how it came to its new position. As far as we can tell, the Air Force never undertook to determine whether the material that McDonnell Douglas sought to

keep private was actually covered by the Trade Secrets Act; apparently, it was enough that DFAR § 205.303 called for disclosing the cost of all significant contract actions.

After being notified of the Air Force's decision, McDonnell Douglas again sued, this time to block the release of the MLV III options price information. This action was litigated concurrently with the motion for reconsideration still pending in the initial lawsuit over the Delta II options.

## II.

In both district court proceedings, McDonnell Douglas maintained that the prices of the exercised options were protected from disclosure by the Trade Secrets Act. Its argument relied upon the statement in *CNA Financial Corp. v. Donovan*, a "reverse-FOIA" case, that the Trade Secrets Act was "at least co-extensive" with Exemption 4. 830 F.2d at 1151.[2] From this it followed that the options pricing information would necessarily be protected under the Trade Secrets Act if it could be shown to fall within the scope of the exemption. McDonnell Douglas claimed that the option price information did so because it had been "voluntarily" provided, was marked confidential, and "would customarily not be released to the public," satisfying the standard set forth in *Critical Mass*, 975 F.2d at 879–80. In presenting this argument, McDonnell Douglas relied in part upon the Air Force's prior position on the applicability of Exemption 4 expressed in the decision memoranda responding to General Dynamics' FOIA request.

McDonnell Douglas recognized, of course, that whether options pricing information was a trade secret protected by the Act did not end the case. As noted, the statute allows for the release of covered information if "authorized by law," 18 U.S.C. § 1905, and the government claimed that Defense Depart-

---

1. Two of these options were exercised in June 1993. McDonnell Douglas made no objection to the Air Force's corresponding cost announcement, but it notified the Air Force that it might seek to block similar announcements in the future.

2. Although we suppose it is possible that this statement is no longer accurate in light of our recently more expansive interpretation of the scope of Exemption 4 in *Critical Mass*, 975 F.2d at 879, the Air Force has not argued that we should reconsider our understanding of the relationship between the two provisions.

ment regulations required disclosure. Accordingly, it was also McDonnell Douglas' position—and it is a subtle and difficult argument—that, under *Chrysler v. Brown,* the regulation pursuant to which the Air Force proposed to release the information could not properly be considered a "law" within the meaning of the exception. This was so because, in McDonnell Douglas' view, none of the statutes upon which the Defense Department had arguably relied in promulgating DFAR § 205.303 could be thought to have contemplated an administrative restriction of the rights secured by the Trade Secrets Act. *See Chrysler,* 441 U.S. at 306, 99 S.Ct. at 1720.

The government, for its part, argued that it was not open to the district court to rule that the information in question was covered by the Trade Secrets Act (or, what amounts to the same thing, by Exemption 4). In the administrative action under review, the Air Force had simply concluded that *whether or not* such information was confidential and therefore protected (at least partly a factual question), publication was authorized by regulation. It never determined, in other words, whether Exemption 4 would have allowed it to exclude the exercised options prices from any FOIA release. The government claimed that the Air Force's actions in proposing to announce the exercised options prices had been limited to deciding that the release was "authorized by law" as a consequence of DFAR § 205.303. Since McDonnell Douglas' suit was one for review of administrative action, it would be inappropriate, the argument ran, for the court to question whether the exercised option prices fell within Exemption 4. The court could only decide whether DFAR § 205.303 provided the sort of "authoriz[ation] by law" required under *Chrysler.* Moreover, although the Air Force had not determined whether release could also have been justified on the alternative ground that the information was not even *covered* under the Trade Secrets Act, neither had it waived that argument. Thus, the government asserted, the district court could not

enjoin the Air Force from announcing the information without first allowing it to explore the potential alternative basis for the legality of the release.

This time the district court reversed its position, holding that the Air Force could announce the prices of the exercised options. The court reasoned that it did not need to resolve the "vigorously dispute[d]" issue whether McDonnell Douglas' exercised option prices were "trade secrets," because it was able to conclude that the Air Force's intended release was "authorized by law" within the meaning of *Chrysler.* Since it considered § 205.303 to have been promulgated by the Defense Department in keeping with the Office of Federal Procurement Policy Act of 1974, 41 U.S.C. §§ 401 *et seq.* (1988), it concluded that the regulation met the *Chrysler* requirement that the agency regulation relied upon be based upon "some delegation of the requisite legislative authority by Congress." 441 U.S. at 304, 99 S.Ct. at 1718–19. Consistent with this new understanding, the court modified its initial decision in the Delta II case, and dissolved the injunction.

### III.

 The government claims here, as it did below, that the issue of coverage—whether the prices of options that have been exercised are "trade secret" information protected by the Act—was reserved at the administrative level and cannot be decided by a reviewing court before the Air Force decides the issue for itself. Actually, the issue was not explicitly reserved in the specific actions under review—the determinations to release the exercised option prices in the contract announcements. Indeed, the Air Force never even stated its reasons for rejecting McDonnell Douglas' arguments. From the record, it appears that the Air Force simply informed McDonnell Douglas that the prices of the exercised options would be disclosed in keeping with DFAR § 205.303.[3] Only in its

---

**3.** Initially, Air Force legal personnel counseled against releasing the prices of the MLV III options in light of the injunction issued in the Delta II case. No decision was communicated to

McDonnell Douglas, however, which wrote the Air Force seeking assurances that the prices would not be released when the options were exercised. A later, undated legal memorandum

FOIA memorandum did the Air Force indicate that exercised option prices might not be covered by the Trade Secrets Act. And there, it declined to decide that question, which it thought was being addressed in court in the first phase of this proceeding.

The government would at this point prefer to litigate on the grounds it relied upon in the district court—that § 205.303 authorizes the release of the exercised option prices, whether or not such information can be considered a "trade secret" within the meaning of § 1905. Yet its arguments to this court, although not expressly directed at the issue, implicitly contest trade secrets coverage of the options pricing information. In claiming (as *Chrysler* requires) that Congress authorized the adoption of acquisition regulations that call for public announcements of significant expenditures, the government does not argue that the Air Force would be justified in releasing *any* confidential contract information; rather, it claims only that the Air Force is justified in announcing the sort of information proposed for release in this case—the amount of appropriated funding expended for a particular purpose. It is authorized to do so, we are told, because such information, in the government's phrase, "is normally disclosed to the public." But this argument plainly shades into the ostensibly disclaimed notion that the prices of exercised options are not proper "trade secrets" at all.

Although the idea that a price charged to the government for specific goods or services could be a "trade secret" appears passing strange to us, we agree with the government that it is not open to us to attempt to decide that issue at this stage. The district court was asked under the APA to review governmental action (or proposed governmental ac-

tion) and—although the record is hardly clear—the Air Force has never stated its position on McDonnell Douglas' claim that even exercised option prices are trade secrets. To be sure, the government on appeal contends that its DFAR regulations override whether or not the exercised option prices fall within that category. But as we have noted, its authorization argument is intertwined analytically with the coverage issue. Given the confusing administrative record—perhaps caused by the intersection of the FOIA actions and the contract announcements—and the interrelationship between the two legal questions, we think the preferable course is to remand so that we can have one considered and complete statement of the Air Force's position on McDonnell Douglas' claim. That is not to say that a governmental agency must adopt a formal adjudication mode, or any part of it, in order to make an administrative decision, nor that it must decide in any particular order the two questions of coverage and authorization that are raised by a Trade Secrets Act challenge to governmental disclosure. But this case, in light of the several decision memoranda and other material made part of the record, as well as the overlapping of the Air Force's treatment of the two issues, comes to us in an unusual posture, and therefore we remand to the district court with instructions to remand to the Air Force.

*So ordered.*

seems to indicate that the Air Force had decided on announcement and expected to be sued, because it states that confidential markings on the contract and McDonnell Douglas' proposal

"could complicate the Government's case." Eventually, McDonnell Douglas was notified by telephone that the Air Force had decided to include the options prices in its announcement.